**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

**June 10, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

UNITED STATES OF AMERICA,

    Plaintiff - Appellant,

v.

JUSTIN PECK,

    Defendant.

-----------------------------

JESSE DUNN,

    Claimant - Appellee.

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellant,

v.

JUSTIN PECK,

    Defendant.

-----------------------------

JESSE DUNN,

    Third-Party Petitioner -
Appellee.

No. 23-4000

No. 23-4038

_____

**Appeals from the United States District Court
for the District of Utah
(D.C. No. 2:20-CR-00185-HCN-1)**

_____

Tyler L. Murray, Assistant United States Attorney (Trina A. Higgins, United States Attorney, with him on the briefs), Salt Lake City, Utah, for Plaintiff-Appellant.

James C. Bradshaw (Ann Marie Taliaferro with him on the brief) of Brown Bradshaw & Moffat, Salt Lake City, Utah for Claimant-Appellee and Third-Party Petitioner-Appellee.

_____

Before **PHILLIPS**, **KELLY**, and **ROSSMAN**, Circuit Judges.

_____

**ROSSMAN**, Circuit Judge.

_____

This appeal concerns an ancillary proceeding under Federal Rule of Criminal Procedure 32.2(c) and 21 U.S.C. § 853(n). Ancillary proceedings address third-party interests in property deemed forfeitable to the United States in criminal cases. Claimant-Appellee Mr. Jesse Dunn filed a third-party petition claiming he owned a parcel of land in West Jordan, Utah (West Jordan Lot or Lot) that the government sought to forfeit in Mr. Justin Peck's criminal case. The government sought the West Jordan Lot because Mr. Peck—who was convicted after pleading guilty to operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960,

2

and who is not a party to this appeal—allegedly held an ownership interest in the Lot. The district court agreed with Mr. Dunn and blocked the forfeiture. The government now challenges that ruling. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I[1]

We first discuss the factual and procedural background relevant to this appeal. We then consider and reject Mr. Dunn's contention we lack appellate jurisdiction. Finally, we address the merits, explaining why we discern no error in the district court's decision to grant Mr. Dunn's third-party petition.

## A

From 2012 to 2019, Mr. Peck operated unlicensed money transmitting businesses. Mr. Dunn was one of Mr. Peck's employees. On March 14, 2018, Mr. Dunn purchased the West Jordan Lot for $475,000. He paid for the Lot with a variety of funds, including a hard-money loan from a Utah-based title company for $280,500, approximately 59% of the price. On March 15, 2018, Mr.

---

[1] The facts recited here derive mostly from Mr. Peck's criminal proceedings and the ancillary proceedings. We accept the district court's findings of fact unless clearly erroneous. *See United States* v. *Holy Land Found. for Relief & Dev.*, 722 F.3d 677, 683 (5th Cir. 2013); *United States* v. *Furando*, 40 F.4th 567, 575 (7th Cir. 2022); *see also United States* v. *Gordon*, 710 F.3d 1124, 1165 (10th Cir. 2013) (applying this standard to final orders of forfeiture).

Dunn secured that loan with a deed of trust. Neither Mr. Peck nor his funds were involved in this initial purchase or in the hard-money loan. But on October 2, 2018, Mr. Peck authorized a $304,795 wire transfer from an account including tainted funds to pay off Mr. Dunn's loan. This payment satisfied the loan and returned unencumbered title to Mr. Dunn.

In July 2020, the government prosecuted Mr. Peck for violating 18 U.S.C. § 1960. Section 1960 applies to "whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business." The government also notified Mr. Peck of its intent to seek forfeiture of the West Jordan Lot under 18 U.S.C. § 982(a)(1).

Mr. Peck pled guilty under a plea agreement in August 2020. Mr. Peck promised to "forfeit all property acquired from or traceable to my offense." App. I at 25. The plea agreement further specified Mr. Peck agreed to forfeit the West Jordan Lot, "[a] money judgment equal to the value of all property not available for forfeiture," and "[s]ubstitute property as allowed" by law. App. I at 25. At Mr. Peck's subsequent change-of-plea hearing, the government confirmed Mr. Peck agreed to forfeit the Lot. When the magistrate judge[2] asked if Mr. Peck had anything to add, defense counsel said Mr. Peck "does not have any interest in that property," meaning the West Jordan Lot. App. II at 297.

---

[2] Mr. Peck consented to allow a magistrate judge to accept his guilty plea.

The magistrate judge acknowledged the disclaimer about Mr. Peck's ownership interest in the Lot. Still, the magistrate judge accepted Mr. Peck's guilty plea and set a date for sentencing before the district court.

In October 2020, the government moved to forfeit only the West Jordan Lot—no other property—under Federal Rule of Criminal Procedure 32.2 and 18 U.S.C. § 982(a)(1). The Lot was forfeitable, the government maintained, because the government had "established the requisite nexus between the specific real property it seeks to forfeit and Defendant's offense of conviction." App. I at 32. In support, the government pointed to the facts in Mr. Peck's plea agreement. *See* App. I at 25 (plea agreement stating the Lot is "property . . . traceable to [Mr. Peck's] offense"); Fed. R. Crim. P. 32.2(b)(1)(B) (confirming plea agreements may provide evidence to establish nexus for preliminary orders of forfeiture). The government made no mention of defense counsel's representation at the change-of-plea hearing that Mr. Peck did not have "any interest" in the Lot. App. II at 297. Days later, the district court entered a preliminary order of forfeiture. The order stated "defendant Justin Peck must forfeit to the United States any property . . . including *and limited to*: [the West Jordan Lot]." App. I at 38 (emphasis added). The district court then set a 30-day period for third parties to assert their interests in the Lot—the only property deemed forfeitable in Mr. Peck's criminal case. *See* 21 U.S.C. § 853(n)(2).

5

**B**

**1**

In December 2020,[3] Mr. Dunn filed a third-party petition asserting his interest in the Lot. Mr. Dunn sought to show "the purported order of forfeiture [was] invalid" and the Lot should not be forfeited, notwithstanding the district court's preliminary findings. App. I at 49. According to Mr. Dunn, the order was invalid because his interest in the Lot was superior to Mr. Peck's and the government's. Mr. Dunn was not a party to Mr. Peck's criminal case, so he could obtain relief only by filing a third-party petition at this stage. *See United States* v. *Andrews*, 530 F.3d 1232, 1236 (10th Cir. 2008) ("[A] third party has no right to challenge the preliminary order's finding of forfeitability; rather, the third party is given an opportunity during the ancillary proceeding to assert any ownership interest . . . ."); *see generally* 21 U.S.C. § 853(n); Fed. R. Crim. P. 32.2(b)(2)(A), (c).

In April 2021, while Mr. Dunn's petition was pending, the district court sentenced Mr. Peck to two years' probation. Neither the government nor Mr. Peck asked the district court to amend the forfeiture order at sentencing. The

---

[3] The district court permitted third-party petitions "within thirty days of the final publication of notice or receipt of notice, whichever is earlier." App. I at 40. The government posted notice of the preliminary order of forfeiture from October 14 to November 12, 2020. Thus, Mr. Dunn's December 3, 2020 petition was presumptively timely. Nobody argues otherwise.

government confirmed it sought to forfeit the West Jordan Lot and that it had no "intent on trying to collect [a] money judgment" from Mr. Peck. Supp. App. at 27. The district court ordered Mr. Peck to forfeit his interest in the Lot.

In December 2021, the district court held an evidentiary hearing on Mr. Dunn's third-party petition. The government agreed Mr. Dunn's down payment for the Lot in March 2018 "did not come from [Mr. Peck's] tainted funds." App. II at 313. It also stipulated the Lot was never "used to facilitate any unlawful activity [and] that it was not an instrumentality of any unlawful activity." App. II at 355.

Internal Revenue Service (IRS) Special Agent Cameron Maxfield testified. He explained an IRS investigation revealed Mr. Dunn was a signatory on Mr. Peck's tainted bank accounts. According to Agent Maxfield, the wire transfer that paid off Mr. Dunn's loan included tainted funds. Agent Maxfield acknowledged title to the West Jordan Lot "was not encumbered by Mr. Peck in any way." App. I at 375.

Mr. Dunn also testified. According to Mr. Dunn, Mr. Peck authorized him to wire the $304,795 to pay off the hard-money loan in October 2018. Mr. Dunn claimed he then paid Mr. Peck $205,000 in cash, but Mr. Peck did not ask him to repay the remaining approximately $100,000. Mr. Dunn said he never understood Mr. Peck to hold any ownership interest in the Lot. In a post-hearing brief, the government clarified it did not seek to forfeit the entire Lot,

7

but only "that portion of the West Jordan Property" attributable to tainted funds. App. I at 165.

**2**

The district court issued a written order granting Mr. Dunn's third-party petition. The court first found Mr. Dunn paid the down payment on the Lot without using Mr. Peck's tainted funds, the Lot "was not an instrumentality of, or used to facilitate, Mr. Peck's offense," but "[p]roceeds of Mr. Peck's offense were used to pay off the hard money loan." App. I at 200–01.

The district court next set out the applicable legal framework, which it described as the "two-step process for criminal forfeitures" required by 21 U.S.C. § 853 and Fed. R. Crim. P. 32.2.[4] App. I at 201. The first step requires a court to "determine whether the government has established the requisite nexus between the property and the offense." App. I at 201 (quoting Fed. R. Crim. P. 32.2(b)(1)(A)). "If this nexus is established," the district court explained, a "court must enter a preliminary order of forfeiture 'without regard to any third party's interest in the property.'" App. I at 201 (quoting Fed. R. Crim. P. 32.2(b)(2)(A)). "At the second step," the district court continued, a third party may "petition the court for a hearing to adjudicate the validity of

---

[4] Although the government sought forfeiture under 18 U.S.C. § 982(a)(1), "[t]he forfeiture of property under [that] section . . . shall be governed [in part] by the provisions of section 413 . . . of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. [§] 853)." 18 U.S.C. § 982(b)(1).

his alleged interest in the property." App. I at 202 (quoting 21 U.S.C. § 853(n)(2)). And after such an "ancillary proceeding, the court must amend the forfeiture [order] to account for the third-party petitioner's interest if the petitioner establishes by a preponderance of the evidence" that his interest prevails over the government's. App. I at 202 (citing 21 U.S.C. § 853(n)(6)). The district court explained a third party will have such a prevailing interest if he

> has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section . . . .

App. I at 202 (quoting 21 U.S.C. § 853(n)(6)(A)).

Turning to the merits of Mr. Dunn's third-party petition, the district court held, under § 853(n)(6)(A), "Mr. Dunn had a legal right, title, or interest in the disputed property that renders the order of forfeiture invalid." App. I at 202. "[A]t the time Mr. Peck committed his crime," the district court reasoned, "title to the property was vested in Mr. Dunn rather than Mr. Peck or at least Mr. Dunn's interest in the property was superior to that of Mr. Peck." App. I at 202.

The district court recognized "[s]tate law defines ownership interests" in ancillary proceedings. App. I at 203 (citing *Andrews*, 530 F.3d at 1238).

9

Applying Utah law, the district court determined that, since March 2018, Mr. Dunn held a superior interest in the West Jordan Lot as compared to Mr. Peck. Even if Mr. Dunn incurred a debt to Mr. Peck after he helped pay off the hard-money loan, that new debt did not grant Mr. Peck an ownership interest in the Lot. App. I at 204 ("[A] subsequent lender does not somehow obtain a legal interest in collateral securing a previous loan from a different lender simply because the borrower obtains an unsecured loan from the second lender and then uses the proceeds of that loan to pay off the first loan."). The district court then vacated the preliminary forfeiture order, concluding vacatur was the "only amendment that can account for Mr. Dunn's interest."[5] App. I at 205. The government timely appealed.[6]

---

[5] Federal Rule of Criminal Procedure 32.2(c)(2) requires a district court to "amend" its preliminary order. As explained above, the district court considered vacatur to be "the only amendment that can account for Mr. Dunn's interest" under the circumstances. App. I at 205. Because neither party contests this nor articulates why vacatur has different consequences than amendment, we assume without deciding that vacatur served as a valid amendment under Rule 32.2(c)(2). *See Crowson* v. *Wash. Cnty.*, 983 F.3d 1166, 1181 n.9 (10th Cir. 2020) (declining to reach an issue "without the benefit of adequate adversarial briefing").

[6] After the district court granted his petition, Mr. Dunn moved to release a notice of *lis pendens* the government had placed on the Lot in July 2020. "The purpose of recording a notice of *lis pendens* on a piece of real property is to provide constructive notice to subsequent purchasers and encumbrancers of litigation affecting the title to [the] real property." *United States* v. *Jarvis*, 499 F.3d 1196, 1202–03 (10th Cir. 2007) (internal quotation marks omitted). The district court granted Mr. Dunn's motion. The government moved to stay that ruling pending appeal, but the court denied the government's motion to stay.

10

**II**

Mr. Dunn has filed a motion urging us to dismiss the government's appeal for lack of appellate jurisdiction. Our court has not previously considered when the government may appeal an order granting a third-party petition in an ancillary proceeding under 21 U.S.C § 853(n) and Federal Rule of Criminal Procedure 32.2(c). But the first principles we invoke are common to all questions of appellate jurisdiction. "Without jurisdiction the court cannot proceed at all in any cause." *Ex parte McCardle*, 74 U.S. 506, 514 (1868). "Thus, 'the question of this Court's jurisdiction (i.e., our appellate jurisdiction) is *antecedent* to all other questions . . . .'" *In re Lang*, 414 F.3d 1191, 1195 (10th Cir. 2005) (quoting *Petroleos Mexicanos Refinacion* v. *M/T KING A (Ex–TBILISI)*, 377 F.3d 329, 333 n.4 (3d Cir. 2004)).

Mr. Dunn makes two arguments supporting a jurisdictional dismissal, but neither is availing.

Mr. Dunn first contends the order on appeal is not a final decision under 28 U.S.C. § 1291 "because the Government may seek another order of forfeiture." Aplee. Mot. to Dismiss at 4. "[W]e may usually hear appeals only from 'final decisions of the district courts of the United States.'" *McClendon* v.

---

The government then timely appealed the district court's orders concerning the notice of *lis pendens* and the stay. The government also asked us to stay the district court's rulings on appeal, and we granted the government's motion.

11

*City of Albuquerque*, 630 F.3d 1288, 1292 (10th Cir. 2011) (quoting 28 U.S.C. § 1291). "Determining finality . . . is a functional inquiry." *In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th 1126, 1171 (10th Cir. 2023). We ask whether the district court "signal[ed] the litigation is over" or "disassociate[d]" itself "from the case." *McClendon*, 630 F.3d at 1295; *see also id.* at 1292 ("A final decision is, put differently, one by which the district court 'disassociates itself from a case.'" (quoting *Swint* v. *Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995)).

Here, the order on review is a final decision for purposes of § 1291. *See id.* at 1292–95. As the government persuasively argues, the order definitively resolved the ancillary proceeding and "left nothing more to be decided." Gov't Resp. to Mot. to Dismiss at 8. The district court concluded Mr. Dunn alone held legal title to the Lot, and as a result, "the United States cannot obtain criminal forfeiture of that property." App. I at 211. It accordingly granted Mr. Dunn's motion and vacated the preliminary forfeiture order. These actions left the court with nothing else to decide. *McClendon*, 630 F.3d at 1292; *see United States* v. *Holy Land Found. for Relief & Dev.*, 722 F.3d 677, 684 (5th Cir. 2013) (treating decision for petitioners in ancillary proceeding as final appealable judgment); *see also United States* v. *Furando*, 40 F.4th 567, 575 (7th Cir. 2022) ("An appeal after a district court's decision regarding ancillary proceedings under 21 U.S.C. § 853(n), is sound as a final judgment under 28 U.S.C. § 1291.").

12

Mr. Dunn next insists the government lacks the requisite statutory authority to appeal. "In the absence of express statutory authority," Mr. Dunn explains, "no appeal may be taken on behalf of the United States in any federal criminal case." Aplee. Mot. to Dismiss at 4. And, he goes on, "[t]he order at issue here . . . is not [within] any . . . enumerated grant[] of authority to appeal." Aplee. Mot. to Dismiss at 5.

This argument is misplaced. To be sure, "[i]n *criminal cases*, the government is denied the right of appeal absent express statutory authority to do so." *United States* v. *Kemp & Assocs., Inc.*, 907 F.3d 1264, 1273–74 (10th Cir. 2018) (emphasis added) (citing *United States* v. *Hines*, 419 F.2d 173, 174 (10th Cir. 1969)). But ancillary proceedings are not treated like criminal cases. The Federal Rules of Criminal Procedure treat ancillary proceedings according to the rules applicable in civil cases. *See, e.g.*, Fed. R. Crim. P. 32.2(c)(1)(B) ("[T]he court may permit the parties to conduct discovery in accordance with the Federal Rules of *Civil* Procedure . . . . When discovery ends, a party may move for summary judgment under Federal Rule of *Civil* Procedure 56." (emphasis added)). The text of § 853(n) also indicates Congress understood an ancillary proceeding—which concerns third-party interests in property deemed forfeitable—to be distinct from the underlying criminal case. *See* 21 U.S.C. § 853(n)(5) (requiring the district court to "consider the relevant portions of the record *of the criminal case which resulted* in the order of forfeiture" (emphasis

13

added)). And in a variety of other circumstances, our sister circuits have considered ancillary proceedings to be civil in nature. *See, e.g.*, *United States* v. *Daugerdas*, 892 F.3d 545, 552 (2d Cir. 2018) (noting ancillary proceedings are "adjudicated in a manner similar to a civil case"); *United States* v. *Lavin*, 942 F.2d 177, 182 (3d Cir. 1991) ("Given that our decision in this appeal will have absolutely no effect on Lavin, the criminal defendant, we think that the [appellee] strains reason in attempting to characterize a proceeding under section 853(n) as a 'criminal case.'"); *United States* v. *Moser*, 586 F.3d 1089, 1093 (8th Cir. 2009) ("Several courts have . . . compar[ed] the proceedings to quiet title actions, or view[ed] the procedural framework, the parties involved, the burdens of proof, or the issues involved as establishing that § 853(n) proceedings are civil in nature."); *United States* v. *Segal*, 938 F.3d 898, 903 n.1 (7th Cir. 2019) (collecting "decisions from other circuits applying the civil deadline of Rule 4(a) to similar, essentially civil, proceedings within criminal cases"). Finally, we find instructive that the Fifth Circuit has considered the government's appeal of an adverse ruling in an ancillary proceeding without ever questioning whether the government had the right to appeal. *Holy Land Found. for Relief & Dev.*, 722 F.3d at 684 ("[T]he government's notice of appeal was proper and timely, and we may exercise jurisdiction over the appeal."). Mr. Dunn points to no contrary authority or any case that counsels against our reasoning.

14

We thus conclude appellate jurisdiction exists and proceed to the merits.

**III**

In evaluating the disposition of an ancillary proceeding, we review the district court's findings of fact for clear error and its legal conclusions *de novo*. *See Holy Land Found. for Relief & Dev.*, 722 F.3d at 683; *Furando*, 40 F.4th at 575; *see also United States* v. *Gordon*, 710 F.3d 1124, 1165 (10th Cir. 2013) (applying this standard to final orders of forfeiture). The government seeks reversal because once "Peck's criminal proceeds were used to pay off the hard money loan [in October 2018], the United States had a corresponding forfeitable interest in the West Jordan [Lot]." Op. Br. at 16. Mr. Dunn contends affirmance is required because "Peck . . . has never held[] any interest in the [Lot]." Resp. Br. at 1. We agree with Mr. Dunn. As the district court correctly determined, the record shows Mr. Dunn has always held a "superior" interest in the Lot, as compared to the government or Mr. Peck, under the relevant forfeiture statute. 21 U.S.C. § 853(n)(6)(A).

We start by describing the applicable law, beginning with the threshold question of whether property is forfeitable in a criminal proceeding and then turning to the third-party petition process. We next explain why the district court correctly vacated the forfeiture order after concluding neither Mr. Peck's nor the government's interest in the Lot—the only property at issue—was

15

superior under state law to Mr. Dunn's interest. Finally, we show why the government's contrary arguments are unavailing.

## A

"Criminal forfeiture is an *in personam* action . . . imposed as a punishment against the defendant." *United States* v. *Jarvis*, 499 F.3d 1196, 1203 (10th Cir. 2007); *United States* v. *$39,000 In Canadian Currency*, 801 F.2d 1210, 1218 (10th Cir. 1986) (similar). "Forfeitures are not favored; they should be enforced only when within both letter and spirit of the law." *United States* v. *One 1936 Model Ford V-8 De Luxe Coach*, 307 U.S. 219, 226 (1939). As the district court correctly recognized—and the parties do not dispute—18 U.S.C. § 982, 21 U.S.C. § 853, and Federal Rule of Criminal Procedure 32.2 together "provide a two-step process for criminal forfeitures." App. I. at 201; *see also* 18 U.S.C. § 982(b)(1) (explaining subsections of § 853 play a role in forfeiture proceedings for convictions under § 1960, such as Mr. Peck's); *United States* v. *Bornfield*, 145 F.3d 1123, 1136 (10th Cir. 1998) (discussing relationship between § 982 and § 853 in this context); *see also Daugerdas*, 892 F.3d at 549 (discussing "two-step procedure for completing a [criminal] forfeiture"); *Andrews*, 530 F.3d at 1236 (discussing first and second "stage" of criminal forfeiture). Section 853(o) instructs "the provisions of [§ 853] shall be liberally construed to effectuate its remedial purposes." *See also United States*

16

v. *Nichols*, 841 F.2d 1485, 1495 (10th Cir. 1988) (recognizing "the express command . . . that the act should be liberally construed").[7]

Step one—which is not at issue in this appeal—concerns a threshold determination of forfeitability made in the criminal case. At step one, a district court must decide whether the sought-after property is "subject to forfeiture

---

[7] According to the dissent, "[n]othing indicates that the district court or the majority opinion have liberally construed § 853 to effectuate its remedial purposes." Dissent at 4; *see* Dissent at 8, 10. We respectfully disagree. The dissent largely proceeds from the incorrect premise that § 853 has one "obvious" remedial purpose: "to penalize and to deter criminal activity." Dissent at 4 (quoting *United States* v. *Nichols*, 841 F.2d 1485, 1487 (10th Cir. 1988)). But the statute's plain text refers to plural "*purposes.*" *See United States* v. *Cano-Flores*, 796 F.3d 83, 93 (D.C. Cir. 2015) ("[T]here is nothing to suggest that Congress intended to rank forfeiture maximization above all normal principles."); *Honeycutt* v. *United States*, 581 U.S. 443, 454 n.2 (2017) (confirming § 853(o) does not permit us to "construe [the] statute in a way that negates its plain text"). One aim of the forfeiture scheme—as this case demonstrates—is to protect third parties with "superior" interests in property deemed forfeitable to the government in a criminal case. 21 U.S.C. § 853(n)(6)(A); *see also Caplin & Drysdale, Chartered* v. *United States*, 491 U.S. 617, 629 (1989) ("[T]he statute permits 'rightful owners' of forfeited assets to make claims for forfeited assets before they are retained by the Government."). Contrary to the dissent's suggestion, therefore, a liberal construction of § 853 is not necessarily the one that favors the government. *See United States* v. *Certain Real Prop. Located at 2525 Leroy Lane, W. Bloomfield, Mich.*, 910 F.2d 343, 349 (6th Cir. 1990) ("The protection of innocent owners is no less remedial than official efforts to curb the cascading nationwide drug trade." (internal quotation marks omitted)); *United States* v. *Lavin*, 942 F.2d 177, 184 (3d Cir. 1991) (acknowledging a "liberal[]" construction of forfeiture statutes may be one favoring a third party); *United States* v. *Reckmeyer*, 836 F.2d 200, 208 (4th Cir. 1987) (similar). The dissent also cites *Nichols* to support its view of § 853's remedial purpose. *See* Dissent at 4 & n.1. *Nichols*, however, simply does not address whether § 853(n) aims to protect certain third-party rights.

under the applicable statute." Fed. R. Crim. P. 32.2(b)(1)(A). The applicable

forfeiture statute here is 18 U.S.C. § 982(a)(1). Section 982(a)(1) instructs the

district court to "order that the [defendant] forfeit to the United States any

property, real or personal, involved in such offense, or any property *traceable*

*to* such property." 18 U.S.C. § 982(a)(1) (emphasis added). We have held

property satisfies this "traceable to" standard when "proceeds of the [offense]

enabled the defendant to acquire the property."[8] *Bornfield*, 145 F.3d at 1135

(also stating "traceable to" means "attributable to"). As here, the district court

may make this "nexus" determination by relying on a "written plea

agreement." Fed. R. Crim. P. 32.2(b)(1)(A)–(B).

Once the district court finds property is subject to forfeiture under

federal law, "it must promptly enter a preliminary order of forfeiture setting

forth" specified information.[9] Fed. R. Crim. P. 32.2(b)(2)(A). Importantly, the

---

[8] To be precise, the statute does not address forfeiture of property "traceable to" *an offense*, but only property "traceable to" *other property* that *itself* was "involved in" an offense. 18 U.S.C. § 982(a)(1) (emphasis added). Section 982(a)(1) covers property purchased with proceeds of an offense, then, because those proceeds are property "involved in" the offense. *United States* v. *Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998) ("[I]f a defendant receives $500,000 in cash in a money laundering scheme . . . the government may seize that money as property 'involved in' the money laundering offense. If, on the other hand, the defendant purchases a $500,000 item with that money, the government may seek the item purchased as property 'traceable to' property involved in the money laundering offense.").

[9] Specifically, "[i]f the court finds that property is subject to forfeiture, it must promptly enter a preliminary order of forfeiture setting forth the amount

18

"court must enter the order without regard to any third party's interest in the property." *Id.* That consideration is deferred "until any third party files a claim in an ancillary proceeding"—*i.e.*, until step two. *Id.*; *see Andrews*, 530 F.3d at 1236 (explaining "[i]f the property really belongs to the third party," then "he will prevail and recover his property whether there were defects in the . . . [step one] forfeiture process or not" (citation omitted)).

This case involves step two—the ancillary proceeding—which addresses third-party interests in property deemed forfeitable. *See Daugerdas*, 892 F.3d at 549; 21 U.S.C. § 853(n); Fed. R. Crim. P. 32.2(c); *see also* 18 U.S.C. § 982(b)(1) (cross-referencing § 853). Section 853(n) permits a third party to assert his interest in subject property by filing a petition. *See Andrews*, 530 F.3d at 1236. We have acknowledged the significance of this ancillary proceeding process. "Third parties" must have "an opportunity to assert their rights to the property," because they have "no right to challenge the preliminary order's finding of forfeitability" in the criminal case. *Id.*

The task for a third party under § 853(n), therefore, is to establish an interest in property deemed forfeitable that is superior to the government's

---

of any money judgment, directing the forfeiture of specific property, and directing the forfeiture of any substitute property if the government has met the statutory criteria." Fed. R. Crim. P. 32.2(b)(2)(A).

and the defendant's. To do this, a third party must show, by a preponderance

of the evidence, that he:

> (A) . . . has a legal right, title, or interest in the property, and such
> right, title, or interest renders the order of forfeiture invalid in
> whole or in part because the right, title, or interest was vested in
> the petitioner rather than the defendant or was superior to any
> right, title, or interest of the defendant at the time of the
> commission of the acts which gave rise to the forfeiture of the
> property under this section; or
>
> (B) . . . is a bona fide purchaser for value of the right, title, or
> interest in the property and was at the time of purchase reasonably
> without cause to believe that the property was subject to forfeiture
> under this section . . . .

21 U.S.C. § 853(n)(6). This case does not involve a bona fide purchaser for

value, so we focus on § 853(n)(6)(A).[10]

---

[10] The dissent says § 853(c)—and not § 853(n)(6)(A)—is "[t]he first key statute in this appeal." Dissent at 5. Section 853(c) provides "right, title, and interest in [forfeitable] property . . . vests in the United States upon the commission of the act giving rise to forfeiture under this section." According to the dissent, § 853(c) "means that the government's interest vests no later than when the criminal defendant obtains [criminal] proceeds. That moment necessarily precedes the criminal defendant's transfer to [a] third party." Dissent at 6. The dissent's reading of § 853(c) is not incorrect as a general matter, but it has no bearing on the facts of this case. As Mr. Dunn persuasively points out, "the government never sought . . . a judgment for proceeds." Resp. Br. at 15 (heading capitalization omitted). Rather, the order of forfeiture in Mr. Peck's criminal case—uncontested by the government— said the forfeitable property was expressly "limited to" the Lot. App. I at 29– 37, 38; Supp. App. at 27. "[F]orfeiture applies only to specific assets," the Supreme Court instructs, and "in the likely event that [a] third party has spent [forfeitable] money, the Government must resort to a State's equitable remedies—which may or may not . . . be available." *Kaley* v. *United States*, 571 U.S. 320, 335 n.11 (2014).

We have "recognize[d] that in federal forfeiture proceedings, ownership interests . . . are defined by state law." *Andrews*, 530 F.3d at 1238; *see also United States* v. *Nava*, 404 F.3d 1119, 1128–29 (9th Cir. 2005) ("Federal forfeiture statutes govern the disposition of property, but state law determines what rights, title or interests the various claimants possess in that property."); *United States* v. *Watts*, 786 F.3d 152, 161 (2d Cir. 2015) ("The extent of a petitioner's interest in the forfeited property is determined in accordance with state law."); *United States* v. *Certain Real Prop. Located at 2525 Leroy Lane, W. Bloomfield, Mich.*, 910 F.2d 343, 348 (6th Cir. 1990) (similar). Our precedent and this persuasive authority make sense. "Property interests have long been acquired and defined by state law." *Certain Real Prop. Located at 2525 Leroy Lane, W. Bloomfield, Mich.*, 910 F.2d at 348. That means the

---

Still, the dissent claims the government has a "vested forfeiture right" under § 853(c) without regard to specific assets. Dissent at 6, 8, 9, 10, 13, 15, 16. But there is no such thing. *See Kaley*, 571 U.S. at 335 n.11. And granting the government a free-floating right to forfeit any property, as the dissent proposes, would plainly ignore § 853(n)(6)(A). *See TRW Inc.* v. *Andrews*, 534 U.S. 19, 31 (2001) ("[A] statute ought . . . to be so construed that, if it can be prevented, no clause . . . shall be superfluous, void, or insignificant." (quoting *Duncan* v. *Walker*, 533 U.S. 167, 174 (2001))); *see also Luis* v. *United States*, 578 U.S. 5, 15–16 (2016) ("[W]hether property is 'forfeitable' . . . very much depends on who has the superior interest in the property at issue. . . . [W]e see this in § 853(n)(6)(A) . . . ."); *United States* v. *Wilson*, 659 F.3d 947, 952 (9th Cir. 2011) (explaining "[t]he language of § 853(n)(6)(A) is clear: If the petitioner can show by the preponderance of the evidence that his interest is greater than that of the defendant, the district court is to amend the order of forfeiture").

natural way to compare property interests, as required by § 853(n)(6)(A), begins with state law. *Id.* It also means "a federal common law of property ownership in forfeitures . . . would risk upsetting settled expectations." *Nava*, 404 F.3d at 1128.[11] Explaining the inquiry under § 853(n)(6)(A), the Third Circuit has set forth a helpful rule of thumb: "if the third party had an interest and the defendant did not—then the third party's right outweighs the interest that the government acquires when it steps into the defendant's shoes." *United States* v. *Lucas*, 986 F.3d 224, 227 (3d Cir. 2021) (internal quotation marks omitted).

After determining the parties' relative interests under state law, the district court "must enter a final order of forfeiture by amending the preliminary order as necessary to account for any third-party rights." Fed. R. Crim. P. 32.2(c)(2).

---

[11] The dissent never mentions *Andrews*. This omission may explain why the dissent mistakenly concludes reversal is required. For example, the dissent repeatedly asserts the government can recover funds Mr. Peck "embedded" in the Lot. Dissent at 1, 5, 7, 10, 13, 14, 15, 16, 17. This idea might have intuitive appeal, but the dissent references its potential relation to state law only once, as an aside. *See* Dissent at 7 n.4. The dissent also contends § 853(n)(6)(A) "apportions" property, relying on the statutory language that says forfeiture may be "invalid *in whole or in part.*" Dissent at 9 (quoting § 853(n)(6)(A)). But this language provides a mechanism for partial forfeitures when state law declares a third party has a superior interest in only part of a forfeitable property. Because the dissent's reasoning proceeds without sufficient regard to state law—which unquestionably defines property interests in federal forfeiture proceedings—it cannot guide our inquiry.

**B**

Recall, the only property the government sought to forfeit in Mr. Peck's criminal case was the West Jordan Lot. At step one, the district court found the Lot was forfeitable. That preliminary forfeiture finding is not on review. *Cf. United States* v. *Fabian*, 764 F.3d 636, 638 (6th Cir. 2014) ("§ 853(n) does not permit 'relitigation' of the district court's antecedent determination that an item of property is subject to forfeiture." (citing Fed. R. Crim. P. 32.2 advisory committee's note)). At issue here is only the district court's decision at step two—granting Mr. Dunn's third-party petition and vacating the preliminary forfeiture order under § 853(n)(6)(A). Based on the evidence at the ancillary proceeding, the district court concluded "Mr. Dunn had a legal right, title, or interest in the [Lot] that renders the order of forfeiture invalid because at the time Mr. Peck committed his crime, title to the property was vested in Mr. Dunn rather than Mr. Peck or at least Mr. Dunn's interest in the property was superior to that of Mr. Peck." App. I at 202. As we explain, we discern no error in the district court's reasoning or conclusion.

Because the government sought to forfeit only the Lot, our inquiry under § 853(n)(6)(A) is straightforward.[12] Like the district court, we use Utah law to

---

[12] The dissent says the government "'limit[ed] its request for forfeiture to *the West Jordan Wire proceeds*,' that is, the forfeitable criminal proceeds transferred to secure Dunn's ownership of the lot." Dissent at 11 (quoting App. I. at 161); *see also* Dissent at 10 ("The government wants . . . the embedded

determine whether Mr. Dunn's interest in the Lot was "superior to" Mr. Peck's and therefore the government's. App. I at 203–04 (citing *Andrews*, 530 F.3d at 1238).

Section 853(n)(6)(A) asks whether Mr. Dunn's interest in the Lot was superior to Mr. Peck's "at the time of the commission of the acts which gave rise to the forfeiture." We can resolve this appeal without deciding the precise "time of the commission of the acts which gave rise to the forfeiture" here, because Mr. Dunn's interest in the Lot was superior to Mr. Peck's at *all times* the government suggests may be relevant.[13]

---

criminal proceeds that Peck transferred to Dunn."). But, as we have explained, the record confirms the government only ever sought to forfeit *the Lot* or a portion thereof, not the proceeds that paid off the hard money loan.

[13] Courts appear to disagree whether "the commission of the acts which gave rise to the forfeiture" means (a) the commission of the acts leading to *forfeiture of the property at issue*, or (b) the commission *of the offense*—which could be different times here. 21 U.S.C. § 853(n)(6)(A); *compare United States* v. *Kennedy*, 201 F.3d 1324, 1331 (11th Cir. 2000) ("The acts which gave rise to the forfeiture took place in June 1989, when Kennedy used $50,000 of [stolen] money . . . as an earnest money deposit for the property . . . ."), *with United States* v. *Daugerdas*, 892 F.3d 545, 555 (2d Cir. 2018) ("Although the statute does not define the relevant 'acts,' we have interpreted that language in the context of offense proceeds to refer to the defendant's offense conduct . . . ."). *Nichols* may have directed us to look at the time of the offense. 841 F.2d at 1489 ("[T]he government's interest in the property to be forfeited vests at the time the crime is committed, rather than upon conviction."). The parties do not discuss this issue, so we explore it no further.

As an initial matter, the district court began its analysis in March 2018—when Mr. Dunn purchased the Lot—and the government has never suggested that is the wrong place to start.[14] Between March 2018 and October 2020—when the government moved to forfeit the Lot—there are three periods when either Mr. Dunn's or Mr. Peck's interests in the Lot may have changed:

---

[14] The government presumably *could* have argued we should begin our analysis under § 853(n)(6)(A) in 2012, when Mr. Peck's criminal conduct began. *See Nichols*, 841 F.2d at 1489. Indeed, one passage of the district court's order refers to relative interests "at the time Mr. Peck *committed his crime*." App. I at 202 (emphasis added). Even if such an argument was available, the government never made it. *Nixon* v. *City & Cnty. of Denver*, 784 F.3d 1364, 1366 (10th Cir. 2015) ("The first task of an appellant is to explain to us why the district court's decision was wrong."); *Bronson* v. *Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief.").

There is reason to think the government intentionally did not make this argument. The government observes "the relation-back doctrine . . . vests title in the United States in traceable property as soon as criminal proceeds *are used to purchase such property*." *See* Op. Br. at 29 (emphasis added). The relation-back doctrine comes from § 853(c). Recall, § 853(c) declares title is vested in the United States "upon the commission of the act giving rise to forfeiture." Section 853(n)(6)(A) includes near-identical language—focusing on "the time of the commission of the acts which gave rise to the forfeiture." The government's position, therefore, seems to treat as significant the acts leading to the *forfeiture of the property at issue*. Here, the act giving rise to forfeiture *of the Lot* could not have plausibly occurred before Mr. Dunn purchased it in 2018.

- **March 14 – 15, 2018** – when Mr. Dunn purchased the Lot to when he executed the deed of trust.

- **March 15 – October 2, 2018** – when Mr. Dunn executed the deed of trust to when Mr. Dunn paid off the hard money loan with tainted funds.

- **October 2, 2018 – October 9, 2020** – when Mr. Dunn paid off the hard money loan to when the government sought forfeiture.

As we explain, we have no trouble concluding—like the district court—Mr. Dunn's interest in the Lot has been consistently superior to Mr. Peck's since March 2018. *See* App. I at 204 (district court finding Mr. Dunn would succeed "at all potentially relevant times").

We begin with Mr. Dunn's interests during each period. The government concedes Mr. Dunn purchased the Lot with untainted funds on March 14, 2018. According to Mr. Dunn's undisputed deed of trust, he held title to the lot upon this purchase. *Cf. First Sec. Bank of Utah, N.A.* v. *Banberry Crossing*, 780 P.2d 1253, 1256 (Utah 1989) (explaining a "trust deed is a conveyance by which title to the trust property passes to the trustee"). But when Mr. Dunn executed the deed of trust on March 15, 2018, title passed from Mr. Dunn to a trustee. *Id.*; Utah Code Ann. § 57-1-19(3) (West 1988). At this time, Mr. Dunn retained certain rights over the Lot, such as the right to collect rents and to retake title upon paying the remainder of his debt. *See Stenquist* v. *Jmg Holdings LLC*, 379 P.3d 941, 944 (Utah Ct. App. 2016). Finally, when Mr. Dunn paid off the hard money loan, that "payment of the secured debt extinguishe[d] the . . . deed

26

of trust by itself and instantaneously." *Stenquist*, 379 P.3d at 944 (quoting 55 Am. Jur. 2d *Mortgages* § 318 (2016)). Mr. Dunn then again held title to the Lot.

The government has not shown Mr. Peck ever held *any* interest in the Lot under Utah property law. Indeed, the government does not even attempt to challenge the district court's findings under Utah law. It has therefore waived any argument based on state law, which, recall, governs the relevant inquiry in this case. *See Andrews*, 530 F.3d at 1238 ("We recognize that in federal forfeiture proceedings, ownership interests . . . are defined by state law."); *Reedy* v. *Werholtz*, 660 F.3d 1270, 1275 (10th Cir. 2011) (concluding "[w]e . . . do not address the matter" when the "argument section of [appellant's] opening brief does not challenge the court's reasoning on this point").[15]

Under the circumstances, and on the record before us, we agree with the district court that "at all potentially relevant times," Mr. Dunn possessed a superior interest in the Lot as compared to Mr. Peck and the government. App. I at 204; 21 U.S.C. § 853(n)(6)(A).[16]

---

[15] The dissent suggests some arguments the government might have made under Utah law. *See* Dissent at 7 n.4. But the government never made these arguments, so we do not address them. *Reedy* v. *Werholtz*, 660 F.3d 1270, 1275 (10th Cir. 2011); *Nixon*, 784 F.3d at 1366 (explaining "an appellant" must "explain to us why the district court's decision was wrong"); *see O'Neal* v. *Ferguson Constr. Co.*, 237 F.3d 1248, 1257 n.1 (10th Cir. 2001) ("We will not make arguments for [a party] that it did not make in its briefs.").

[16] The dissent argues *Nichols* "undermines the majority's holding." Dissent at 12. Not so. In *Nichols*, the attorney third parties did not claim to

27

## C

The government's contrary arguments are not convincing.

### 1

The government argues real property can be forfeitable "[w]hen criminal proceeds are used to pay off a mortgage." Op. Br. at 17 (citing, *e.g.*, *United States* v. *Miller*, 911 F.3d 229, 235 (4th Cir. 2018); *United States* v. *Pole No. 3172, Hopkinton*, 852 F.2d 636, 639 (1st Cir. 1988)). Likewise, the government tells us, "criminal forfeiture is not a measure restricted to property owned by the criminal defendant." Op. Br. at 22 (quoting *De Almeida* v. *United States*, 459 F.3d 377, 381 (2d Cir. 2006)); *see also* Op. Br. at 25 (citing *United States* v. *Molina-Sanchez*, 298 F.R.D. 311, 313–14 (W.D.N.C. 2014)). These arguments do not advance the government's cause.

This appeal does not concern whether the Lot was forfeitable under § 982(a)(1), a question of forfeiture's first step. Rather, the issue is whether Mr. Peck's interest in at least a portion of the Lot was superior to Mr. Dunn's under § 853(n)(6)(A), a question of forfeiture's second step. Because the government's cited authorities relate to first-step determinations of

---

have a superior interest under § 853(n)(6)(A). 841 F.2d at 1490 (describing the issue as whether "Congress intended to exempt attorneys' fees from the criminal forfeiture provisions"); *cf. United States* v. *Monsanto*, 491 U.S. 600, 604 n.3 (1989) ("An attorney seeking a payment of fees from forfeited assets under § 853(n)(6) would presumably rest his petition on subsection (B)," not (A).).

forfeitability, they are not relevant or even instructive. *See, e.g.*, *Miller*, 911 F.3d at 235 (considering effect of mortgage payments on whether *criminal defendant* must forfeit property—*i.e.*, on step one); *Molina-Sanchez*, 298 F.R.D. at 313–14 (directly after recognizing "[c]riminal forfeiture is not limited to property owned by the defendant" at step one, explaining "[t]he ancillary proceeding ensures that property belonging to third parties is not inadvertently forfeited" at step two).

### 2

The government also cites a few cases addressing relative interests at forfeiture's second step—the issue before us—but those cases do not compel reversal. In some of those cases, a defendant's spouse filed a third-party petition, and the defendant co-owned the subject property. *United States* v. *Caspersen*, 275 F. Supp. 3d 502, 505 (S.D.N.Y. 2017) ("As a tenant by the entirety, Ms. Caspersen did not possess an interest in the Apartment that was superior to that of her husband."); *United States* v. *Wolf*, 375 F. Supp. 3d 428, 433, 436 (S.D.N.Y. 2019). That third parties may not have superior interests in property *co-owned by defendants* is unsurprising but irrelevant here, where nothing suggests Mr. Peck ever co-owned the Lot under Utah law.

We then arrive at the government's most analogous case, *United States* v. *Totaro*, 345 F.3d 989 (8th Cir. 2003).[17] In *Totaro*, the defendant's wife held title to a property, but the defendant's tainted funds contributed to mortgage payments. *See id.* at 992–96. The wife filed a third-party petition under 18 U.S.C. § 1963(l)(6)(A)—identical to § 853(n)(6)(A)—asserting her ownership interest in the property. *Totaro*, 345 F.3d at 992. The Eighth Circuit disagreed that title was vested in the wife rather than the defendant, or that the wife's interest in the entire property was superior to the defendant's. *Id.* at 995–98. The court stated "we look to state law to evaluate a claim to a legal right, title or interest in the subject property, *so long as doing so does not frustrate a federal interest.*" *Id.* at 994 (emphasis added). And "[i]t would do a severe disservice to the intent and purpose of the [criminal] forfeiture statute if a criminal were able to protect and enjoy [criminal] proceeds by investing them in property titled to a spouse." *Id.* at 996. The Seventh Circuit appears to have reasoned similarly in *United States* v. *Grossman.* 501 F.3d 846, 849 (7th Cir. 2007) (allowing forfeiture of house titled to defendant's wife, over third party's claim, because defendant "admitted that funds from his illegal activity funded the construction of the house" (citation omitted)).

---

[17] At oral argument, the government agreed *Totaro* was its best case. Oral Arg. at 09:03–51.

Whether state law should ever yield to special federal interests in forfeiture proceedings is not a question we must answer to resolve this appeal. To be sure, permitting a defendant to channel tainted funds into a *spouse's* property might create unique risks to the forfeiture regime. For example, a defendant or his children may have inheritance rights in a spouse's property. And a defendant may convey property to his spouse without diminishing his daily enjoyment of it. *Totaro* seemed to recognize these unique risks, reasoning it would frustrate the forfeiture statute if defendants could "*protect*" and "*enjoy*" criminal proceeds by investing them "in property titled *to a spouse*." *Totaro*, 345 F.3d at 996 (emphasis added); *see also Grossman*, 501 F.3d at 847 (explaining title holder was defendant's wife). Similar concerns are not implicated in the case before us.[18]

The Ninth Circuit's decision in *United States* v. *Nava* is more instructive. 404 F.3d 1119. In *Nava*, the government sought to forfeit houses titled to the defendant's daughter, which the defendant had improved with tainted funds.

---

[18] To the dissent, "[t]he main takeaway from *Totaro* is that the Eighth Circuit did not subscribe to the majority's view that § 853(n)(6)(A) divests the government of its vested forfeiture right under § 853(c)." Dissent at 14–15. But *Totaro* neither recognized anything like a "vested forfeiture right," nor suggested § 853(c) overrides § 853(n)(6)(A). *See United States* v. *Totaro*, 345 F.3d 989, 994–97 (8th Cir. 2003). Notably too, even after *Totaro* recognized federal interests, it relied on state law. The Eighth Circuit instructed the district court on remand to determine the relative interests of the defendant and his wife with reference to state divorce law. *Id.* at 999.

*Id.* at 1126–27, 1134. In her third-party petition, the daughter claimed "two of the . . . properties . . . were hers," and she introduced evidence that "[e]xcept for transfers to a bonding company, [she] ha[d] retained title to both properties since 1996." *Id.* at 1126. The district court denied relief. The Ninth Circuit reversed after examining the asserted property interests under state law: "This has been addressed in Montana law. Occasional payments on behalf of another—without some additional evidence of the intent of the parties—do not create a resulting or constructive trust." *Id.* at 1134. Distinguishing cases like *Totaro* because of their exceptional circumstances, the Ninth Circuit explained "[t]he dissent can cite no case in which a court awarded ownership to someone who never held title and did not live on the property, in preference to the titled owner who occupied the property." *Id.* at 1135.

So too here: the government has attempted to forfeit property when state law establishes the property has *always* belonged to a third party, and we do not face the exceptional circumstances present in cases like *Totaro*. And *Nava* was an even closer case than the one before us. In *Nava*, multiple witnesses associated the properties with the defendant rather than his daughter, and some evidence suggested the defendant "might actually control the properties." *Id.* at 1132–33. Nothing like that exists on the record here. *See also Lucas*, 986 F.3d at 228 (recognizing third party's superior property interest over government's equitable complaints).

32

**3**

The government advances a number of concerns about the potential consequences of affirmance. *See, e.g.*, Op. Br. at 24 ("[A] defendant could thwart forfeiture simply by investing proceeds to pay off loans on properties titled to third parties."); Op. Br. at 28 ("Congress . . . created a statutory framework that ensured a criminal defendant could not defeat forfeiture through such transfers and that prevented third parties from obtaining windfalls of property purchased with criminal proceed."). The dissent shares some of these concerns. Dissent at 1 ("With the majority's affirmance, convicted criminals in our circuit can treat their 'friends' to financial windfalls of criminal proceeds once the jig is up and law-enforcement officers begin to close in . . . ."); Dissent at 8 ("This case involves a property lot, but imaginative defendants can surely find a 'friend' with long-held property in which to embed criminal proceeds. Only ignorance can stop this, and word travels fast."). But there is no cause for alarm.

Our decision today in no way suggests defendants may evade responsibility in criminal proceedings by freely transferring tainted funds to third parties. Recall, here, the government sought only to forfeit the Lot, and it did not challenge the district court's order that forfeiture would be "limited to" the Lot. App. I at 29–37, 38; Supp. App. at 27. The government also raised no argument asserting its interest in the Lot under state law.

The government could have pursued other potentially forfeitable property or paths to relief—and it can in future cases. The government can often pursue the actual money proceeds of an offense, 18 U.S.C. § 982(a)(1), or "substitute property," which § 853(p) allows when a defendant's forfeitable property "has been transferred . . . to . . . a third party." *See Bornfield*, 145 F.3d at 1136.[19] The government can also sometimes pursue state law relief. *See Kaley* v. *United States*, 571 U.S. 320, 335 n.11 (2014) (noting government may "resort to a State's equitable remedies" if a "third party has spent the money"). The district court here specifically acknowledged as much, observing "[i]t is possible that Utah law would afford the government some sort of equitable remedy against Mr. Dunn or his real property based on the facts of this case." App. I at 208. Finally, when the government seeks specific property under the federal forfeiture regime—as here—it can attempt to articulate the superiority of its interest under applicable state law.

We do not opine on whether these efforts would have succeeded here. We merely point out the law permits forfeiture through a variety of means, but the government exercised its discretion in Mr. Peck's case to pursue only one. In any event, given the liberties at stake, we would be reluctant to credit the

---

[19] The dissent worries that "[l]eaving the government to chase 'substitute property' under § 853(p) will often be leaving the government with nothing." Dissent at 16. We fail to see how that concern should meaningfully inform the legal analysis.

government's policy concerns absent direction from Congress. *See Lucas*, 986 F.3d at 229 ("The Government must turn square corners when it exercises its power to confiscate private property.").[20]

## IV

We **AFFIRM** the district court's orders granting Mr. Dunn's third-party petition and releasing the *lis pendens*. We **VACATE** this court's order granting a stay of the district court's orders pending appeal.

---

[20] We briefly address the government's two remaining arguments. First, the government contends the district court "erred to the extent it withdrew its nexus finding as part of the ancillary proceeding." Op. Br. at 40. The district court did not withdraw its preliminary nexus finding. The court wrote it would withdraw that finding only to the extent it "somehow pose[d] an impediment" to recognizing Mr. Dunn's interest in the Lot. App. I at 210. Nobody contends the nexus finding posed such an impediment, so we can move on. *See* Op. Br. at 41 (admitting the court may "modify[] the preliminary order of forfeiture to address third-party ownership issues—such as a superior interest"); *see also Andrews*, 530 F.3d at 1237 ("If the property really belongs to the third party, he will prevail and recover his property whether there were defects in the criminal trial or the forfeiture process or not; and if the property does not belong to the third party, such defects in the finding of forfeitability are no concern of his." (internal quotation marks and alterations omitted)).

Second, the government argues the district court erred by releasing the notice of *lis pendens*. Op. Br. at 44. To prevent such release, the government needed to "establish[] by a preponderance of the evidence the validity of the real property claim that is the subject of the notice." Utah Code Ann. § 78B-6-1304(2) (West 2017). Because we affirm, we necessarily agree the government did not carry this burden.

23-4000 & 23-4038, *United States v. Peck*
**PHILLIPS**, J., concurring and dissenting.

I join the portion of the majority opinion concluding that we have appellate jurisdiction. Maj. Op. at 11–15. But I dissent from its affirmance of the district court's ruling that deprives the government of its vested criminal-forfeiture right against Peck's criminal proceeds. The statutes anticipate these sorts of third-party transfers of criminal proceeds and enable the government to recover them by criminal forfeiture, here by prying them from Dunn's lot where Peck and Dunn embedded them. By my reading, the district court misinterpreted the criminal-forfeiture statutes and left a gaping gash in the criminal-forfeiture law. With the majority's affirmance, convicted criminals in our circuit can treat their "friends" to financial windfalls of criminal proceeds once the jig is up and law-enforcement officers begin to close in (all the while professing, of course, that one hand won't later wash the other).

This appeal arises from Justin Peck's conviction for owning and operating an unlicensed money-transmitting business from 2012–2019, in violation of 18 U.S.C. § 1960. In this business, Peck would obtain checks from general contractors for drywall work, cash the checks, and then pay the subcontractors to pay the drywall laborers. As his share, Peck kept a 6%–10% fee from the general contractors' checks, which he deposited into his Shared Investment account at Mountain America Credit Union. Peck wasn't running a middling operation either—all told, he transmitted more than $58 million.

Jesse Dunn was Peck's friend and employee, who was involved in collecting and distributing Peck's business money. In spring 2018, six years into Peck's illegal activity and nearing its end, Dunn bought a real-estate lot in West Jordan, Utah for $475,000. He borrowed $280,500 from a hard-money lender. The loan was secured by a deed of trust. When the loan came due, Peck authorized Dunn to wire $304,795.66 from Peck's Source Investment account (which held his criminal proceeds) to pay off this loan, which Dunn did on October 2, 2018.

As the majority notes, the criminal-forfeiture process has two steps. At the first step, "the court must determine whether the government has established the requisite nexus between the property and the offense." Fed. R. Crim. P. 32.2(b)(1)(A). If the court finds the nexus met, "it must promptly enter a preliminary order of forfeiture setting forth the amount of any money judgment [and] directing the forfeiture of specific property . . . ." *Id.* at 32.2(b)(2)(A). Here, the district court found the nexus met and issued a preliminary forfeiture order. For § 1960 offenses like Peck's, the requirements of the nexus are spelled out at 18 U.S.C. § 982(a)(1)—that subsection requires that the property sought to be forfeited have been "involved in such offense, or [be] any property traceable to such property."

At the second step, on a third party's filing a petition asserting an interest in the property to be forfeited, "the court must conduct an ancillary proceeding," unless the forfeiture is of a money judgment. Fed. R. Crim. P.

2

32.2(c)(1). After the hearing, "the court must enter a final order of forfeiture by amending the preliminary order as necessary to account for any third-party rights." *Id.* at 32.2(c)(2).

The outcome of this appeal depends on statutory interpretation. Before interpreting 21 U.S.C. § 853(c) and § 853(n)(6)(A), we must determine the applicable rule of construction. Here, the majority opinion generally declares that "[f]orfeitures are not favored; they should be enforced only when within both letter and spirit of the law." Maj. Op. at 16 (quoting *United States v. One 1936 Model Ford V-8 De Luxe Coach*, 307 U.S. 219, 226 (1939)). But the majority also acknowledges that a different rule applies under § 853, as here incorporated by 18 U.S.C. § 982(b), which covers Peck's conviction under 18 U.S.C. § 1960.

Specifically, in 21 U.S.C. § 853(o), headed "Construction," Congress imposed this as § 853's rule of statutory construction: "The provisions of this section shall be liberally construed to effectuate its remedial purposes." *See, e.g.*, *United States v. Nichols*, 841 F.2d 1485, 1492 (10th Cir. 1988) (declaring that "[t]his is the only such instruction in a substantive federal criminal law" and then applying that rule in a drug prosecution).

In *Nichols*, our court reviewed the history of criminal forfeiture that preceded its 1988 decision. 841 F.2d at 1487–89. We noted that Congress had reintroduced criminal forfeiture in enacting "[t]he Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 853, and the Organized Crime

3

Control Act of 1970, 18 U.S.C. § 1963," which "was designed both to penalize and to deter criminal activity." *Id.* at 1487. That's an obvious remedial purpose referenced in § 853(o).[1] But that pre-1984 version of criminal forfeiture had a weakness that frustrated this remedial purpose—"[o]nce notified, a potential defendant was able to transfer or conceal his or her assets." *Id.* at 1488. So in 1984 Congress enacted the Comprehensive Crime Control Act, in part to bolster criminal forfeiture by adding a "relation back" provision to § 853(c). *Id.* With that, Congress succeeded in ensuring that "the government's interest in the property to be forfeited vests at the time the crime is committed, rather than upon conviction, as had previously been the case with the CCE and RICO criminal forfeiture provisions." *Id.* at 1489. As we review the present appeal, we must be mindful that Congress has commanded that we liberally construe § 853 to effectuate its remedial purposes.

Nothing indicates that the district court or the majority opinion have liberally construed § 853 to effectuate its remedial purposes of recovering

---

[1] Addressing the remedial purpose of criminal forfeiture, *Nichols* noted that "Congress was concerned with *all* of the methods by which a defendant could shield illegally obtained property from forfeiture." 841 F.2d at 1494. The court referenced "[t]he broad congressional concern with the depletion of any property subject to forfeiture" and said that "[t]his is especially significant in light of the express command in section 853 . . . that the act should be liberally construed so as to serve its remedial purposes." *Id.* at 1494–95. Further, declining the defendant's request to exempt criminal proceeds so he could use those funds to pay his attorneys' fees, the court highlighted "the congressional goal of increasing the forfeiture of criminally obtained assets" and the need to abide "the congressional directive that crime should not pay." *Id.* at 1495. These pronouncements should matter.

criminal proceeds.[2] Had the majority done so, it would not have interpreted

§ 853(n)(6)(A) as *divesting* the government of its § 853(c) vested right to

recover Peck's criminal proceeds that he embedded into the lot (with Dunn

keeping the remaining value of the lot).

The first key statute in this appeal is § 853(c), which reads as follows:

**(c) Third party transfers**

All right, title, and interest in property described in subsection (a) vests in the United States upon the commission of the act giving rise to forfeiture under this section. Any such property that is subsequently transferred to a person other than the defendant may be the subject of a special verdict of forfeiture and thereafter shall be ordered forfeited to the United States, unless the transferee establishes in a hearing pursuant to subsection (n) that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture under this section.

As seen, subsection (c) applies when a criminal defendant like Peck has

transferred criminal proceeds to a third party like Dunn. As mentioned, this

subsection contains a relation-back provision—one vesting the government's

forfeiture right to the property "upon the commission of the act giving rise to

forfeiture under this section." § 853(c). Notably, for criminal proceeds

---

[2] I agree that § 853(o) references "remedial purposes." I also agree that § 853(n)(6)'s provisions protecting a third-party's *legitimate* rights to disputed property might qualify as a remedial purpose. But I note that none of the majority's cited cases on this plural-remedial-purposes point involve a third party like Dunn, one concededly not a bona fide purchaser or a person who owned his interest in the criminal proceeds before the government's interest in those criminal proceeds vested. *See* Maj. Op. at 17 n.7. Thus, I see no way that either a statutory remedial purpose or a liberal construction would apply to Dunn or help him.

transferred to a third party, this means that the government's interest vests no later than when the criminal defendant obtains the proceeds. That moment necessarily precedes the criminal defendant's transfer to the third party (no one contends that Dunn is a bona fide purchaser for value). This means that the government had a vested forfeiture right *before* Peck transferred criminal proceeds to Dunn. And this was by Congress's design—it sought to solve a recurring problem, criminal defendants bypassing criminal forfeiture by transferring proceeds to third parties.

Our second key statute in this appeal is § 853(n)(6), which reads as follows:

**(n) Third party interests**

**(6)** If, after the [ancillary] hearing, the court determines that the petitioner has established by a preponderance of the evidence that—

> **(A)** the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or

> **(B)** the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;

the court shall amend the order of forfeiture in accordance with its determination.

6

As seen, subsection (n)(6)(A) addresses the third party's rights to the property versus the defendant's. No one says that Peck ever had a legal right, title, or interest in Dunn's lot. So I see nothing by which the majority can divest the government of its vested right of forfeiture provided by subsection (c). As with that subsection, the only way I can see the government losing its vested right would be if Dunn qualified as a bona fide purchaser under subsection (n)(6)(B). And no one contends that he was one.

The majority opinion applies subsection (n)(6)(A), as it understands it, without sufficiently heeding subsection (c). Relying on subsection (n)(6)(A),[3] the majority holds that because Dunn's right *in the lot* preceded any interest of Peck or the government *in the lot* (neither ever had an interest in the lot), Dunn owns the lot *including Peck's embedded criminal-proceeds money*.[4] That divests

---

[3] Dunn does not contend that he qualifies as a bona fide purchaser for value (of the criminal proceeds Peck transferred to him with his assistance) either under subsection (c) or (n)(6)(B).

[4] Utah's fraudulent-transfer statutes undo commonplace fraudulent transfers like those from Peck to Dunn. Section 25-6-202 voids a debtor's transfer if he made the transfer with actual intent to hinder the creditor, and without receiving a reasonably equivalent value in exchange for the transfer. Utah Code Ann. § 25-6-202 (West 2025). If the transferee is like Dunn, and did not take in good faith and for reasonably equivalent value, judgment may be entered against him or "the person for whose benefit the transfer was made." Utah Code Ann. § 25-6-304(2)(b) (West 2025). The creditor's remedies include attachment against the asset transferred or "execution on the asset transferred or its proceeds." Utah Code Ann. § 25-6-303(2) (West 2025).

In other words, when a debtor avoids a debt by stashing his money in someone else's hands, Utah law doesn't leave the creditor empty handed. And that's true even if the money is embedded into real property. The creditor can

*(footnote continued)*

7

the government of its § 853(c) vested forfeiture right to Peck's transferred criminal proceeds. For numerous reasons, I disagree with the majority's statutory interpretation and its conclusion.

**First**, as noted, the majority applies a statutory-construction rule that disfavors forfeiture rather than promotes it as commanded by § 853(o). In short, the majority does not "liberally construe" § 853—including its subsection (n)(6)(A)—"to effectuate [§ 853's] remedial purposes." § 853(o). Nothing in subsection (n)(6)(A)'s text purports to undo subsection (c). But the majority interprets subsection (n)(6)(A) as undoing subsection (c), and without a good basis for doing so.

**Second**, the majority's ruling permits what subsection (c) prevents—criminal defendants transferring criminal proceeds to third parties to shield the proceeds from the government's reach. This case involves a property lot, but imaginative defendants can surely find a "friend" with long-held property in which to embed criminal proceeds. Only ignorance can stop this, and word travels fast. Even a "friend" with a bank account might qualify. By elevating Dunn's right to Peck's criminal proceeds above the government's § 853(c)

---

obtain a judgment for the amount of the fraudulently transferred funds and execute that judgment against the asset transferred or its proceeds. *See, e.g.*, *Hafen v. Howell*, 121 F.4th 1191, 1205–06, 1208 (10th Cir. 2024) (affirming summary judgment under Utah law against a debtor's spouse who received a joint tenancy in a property that was paid for, in part, through her debtor-husband's fraudulently transferred funds). That's the essence of the government's forfeiture position in this case—it has sought recovery of only the *criminal proceeds* that Peck embedded into Dunn's lot. *See infra*, 9–12.

8

vested forfeiture right, the majority frustrates Congress's intent to enforce criminal forfeiture. It does so without any statutory plain language directing it be so done and contrary to § 853(o)'s command that § 853 be liberally construed to effectuate that section's remedial purposes. Its statutory interpretation renders § 853(c) a nullity in many cases, this one included.

**Third**, the majority doesn't parse § 853(c) or § 853(n)(6)(A) as one might expect with statutory interpretation. It does not explain how subsection (n)(6)(A)'s text relates to subsection (c), let alone that claims to divest the government of its forfeiture right against Peck's transferred criminal proceeds. And it takes no account of subsection (n)(6)(A)'s comparing Dunn's interest to Peck's and leaving him to show himself a bona fide purchaser to prevail over the government toting a vested forfeiture right under subsection (c). Subsection (n)(6)(A)'s language about the petitioner's interest possibly "render[ing] the order of forfeiture invalid *in whole or in part* . . . ." § 853(n)(6)(A) (emphasis added), is in harmony with the government's aim here—to obtain Peck's criminal proceeds from Dunn's lot and leave him the rest.

Nothing in subsection (n)(6)(A) *dissolves* the government's vested forfeiture right provided by subsection (c). By my reading, subsection (n)(6)(a)'s plain language apportions his lot, with the government recovering its vested criminal proceeds and Dunn keeping the rest. And even if the majority disagrees with my reading of the plain language, it still must explain how that

9

result doesn't comport with a liberal construction effectuating § 853's remedial purposes.

**Fourth**, in my view, the majority opinion goes awry about "property" by divorcing the lot from the criminal proceeds. But that leaves the government's vested forfeiture right under subsection (c) at the curbside. Under the majority's approach, all a criminal and third-party "friend" need do is sink the criminal proceeds into property over which the third party has a better ownership than the government, and goodbye vested forfeiture right. I can't see how that interpretation abides subsection (c) or how it liberally construes § 853 to effectuate that section's remedial purposes.

I think it worth mentioning that the government isn't seeking to forfeit the entire lot and leave Dunn nothing. The government wants what it's entitled to—the embedded criminal proceeds that Peck transferred to Dunn. The government has maintained this approach from the start. In its briefing for the ancillary proceeding, the government stated that "[t]he United States does not dispute that Dunn purchased the real property at issue. Nor does it dispute that Peck is not on [the] title . . . . The question is whether Dunn has a superior interest *in any of the funds used to purchase the property.*" App. vol. I, at 111. (emphasis added). It continued that "the facts are clear that the United States had a superior interest in these funds prior to them being used to payoff [sic] the hard money loan." *Id.* at 112. It alleged that Peck had used his Source Investment account "exclusively for the purpose of facilitating the unlawful

10

conduct, and any proceeds that came from this account are directly traceable to the admitted criminal conduct." *Id.* The government concluded, "The funds provided to Dunn for satisfaction of the hard money loan by Peck were proceeds, and they do not lose their character as such just because they were used to purchase real property." *Id.* at 113.

In its post-ancillary-hearing brief, the government maintained this position. It noted that its "interest in the West Jordan Wire funds vested at the time of the criminal conduct, which predates the wire transfer." *Id.* at 162. And it asserted that "proceeds are not purged of their taint when they are transferred to a third party in exchange for untainted property." *Id.* Except for cases involving bona fide purchasers, as provided for under § 853(n)(6)(B), the government asserted that this fact "does not alter the fact that the money or property remains subject to forfeiture as the proceeds of crime even after transfer." *Id.* at 163. The government "limit[ed] its request for forfeiture to *the West Jordan Wire proceeds*," that is, the forfeitable criminal proceeds transferred to secure Dunn's ownership of the lot. *Id.* at 161.

On appeal, the government has remained consistent, beginning its brief by noting that "[u]nder 18 U.S.C. § 982(a)(1), *the equity in the real property resulting from the payoff of the loan* is traceable to Peck's criminal proceeds and is therefore forfeitable to the United States, even though Peck did not otherwise have a legal interest in the real property." Op. Br. at 1 (emphasis added). It seeks reversal of the district court's ruling and modification of the

11

order of forfeiture "to allow forfeiture of *the portion of the property attributable to Peck's criminal proceeds.*" *Id.* at 2 (emphasis added).

**Fifth**, in my view, *Nichols* undermines the majority's holding. In that case, a criminal defendant sought to reclaim seized criminal proceeds so he could retain defense counsel to defend him against drug charges. *Nichols*, 841 F.2d at 1489–90. The issue was whether "Congress intended to exempt attorneys' fees from the criminal forfeiture provisions in 1984." *Id.* at 1490. Our court ruled that "[p]roperty is not exempted because a defendant wants to use it to pay an attorney any more than property is exempted because a defendant wants to purchase a house or employ a financial advisor." *Id.* at 1492. And the court turned to § 853(c) to evaluate whether criminal proceeds transferred to an attorney would be different. The court noted that a transferee could "defeat the claim of the government" only by establishing "that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture." *Id.* at 1493 (quoting § 853(c)). The court concluded "that the plain language of section 853(c) imposes the same conditions on attorneys as it does on any other third party who seeks to defeat a forfeiture claim." *Id.* I can't see how Dunn is in a better position than Nichols's attorneys were. I note that the court fully enforced subsection (c) and did not interpret subsection (n)(6)(A) as overriding it.

**Sixth**, I don't think that the majority meaningfully distinguishes the government's marquee case, *United States v. Totaro*, 345 F.3d 989 (8th Cir. 2003). There, the court approved the government's vested forfeiture right even though the defendant's criminal proceeds were embedded in property owned by a third party and not the defendant.

The more detailed facts are these: A wife owned property before her husband turned to fraud for which he was convicted and sentenced to a 30-year prison term. As with Dunn, the third party (the wife), owned the property, not the convicted criminal (the husband). *Id.* at 992, 995. But the husband had long lived in the house with his wife and during that time had "funneled some of the proceeds from his RICO crimes" into his wife's checking account, from which she made mortgage payments and funded substantial improvements to the properties. *Id.* at 992–93.

The court held that the wife's bare title was "insufficient to prevent forfeiture under the first clause of [18 U.S.C.] § 1963(*l*)(6)(A)"[5] because the husband's criminal proceeds "paid the mortgage, real estate taxes and upkeep[.]" *Id.* at 996. Despite the wife's sole ownership of the properties, the court concluded that "[i]t would do a severe disservice to the intent and purpose of the RICO forfeiture statute if a criminal were able to protect and

---

[5] *Totaro* noted that "§ 1963(*l*) is identical to the drug crimes forfeiture statute, 21 U.S.C. § 853(n)," meaning that "case law implementing § 853(n) is persuasive in our task of applying § 1963(*l*)." 345 F.3d at 994.

13

enjoy RICO proceeds by investing them in property titled to a spouse." *Id.* The same is true with Peck and Dunn.

The majority opinion tries to distinguish *Totaro* by noting that "[t]o be sure, permitting a defendant to channel tainted funds into a *spouse's* property might create unique risks to the forfeiture regime." Maj. Op. at 31. I see no reason why transfers to "friends" like Dunn don't present at least an equal risk. In both cases, third-party owners had proceeds embedded in the properties. The court approved the government's position in the present appeal—it enabled the government to obtain the embedded criminal proceeds but left the wife's share of the property to her, reversing the district court ruling forfeiting "the entire country estate[.]" *Totaro*, 345 F.3d at 997. Fairness, and a sensible reading of the criminal-forfeiture statutes, prevailed.

If anything, the wife in *Totaro* is more sympathetic than Dunn is. She was not an active participant in transferring the criminal proceeds as Dunn was. And though the majority sees special dangers in transfers to spouses instead of "friends," I don't see why. I suspect that the universe of "friends" who will help transfer criminal proceeds to themselves in one fell swoop is more populated than the universe of spouses. And oftentimes a spouse may be unaware of the criminal conduct, but a friend like Dunn was intimately familiar with Peck's business.

The main takeaway from *Totaro* is that the Eighth Circuit did not subscribe to the majority's view that § 853(n)(6)(A) divests the government of

14

its vested forfeiture right under § 853(c). To avoid frustrating the federal interest in criminal forfeiture, the court permitted the government to obtain the criminal proceeds embedded in the wife's solely owned properties. *Id.* at 998–99.

**Seventh**, I disagree with the majority that its sole-cited case—*United States v. Nava*, 404 F.3d 1119 (9th Cir. 2005)—is "more instructive" than *Totaro*. Maj. Op. at 31–32. I don't see how it is even on point. In *Nava*, the Ninth Circuit reversed a district court's determination that two residential properties belonged to a convicted-criminal father rather than his daughter, in circumstances where the daughter had record title of the properties, the father had never had record title, and the daughter had acquired the titles before the father's charged criminal activity began. *Nava*, 404 F.3d at 1126–27, 1129. The entire dispute was over ownership of the properties.

The majority evidently thinks that *Nava* is instructive because the daughter's claim to ownership of the properties was less certain than Dunn's ownership of the property lot. Though I agree that Dunn's ownership was more certain, I don't see why that would matter. As detailed above, the government has always agreed that Dunn owned the lot (though he needed Peck's criminal proceeds to pay off the loan). This appeal does not turn on ownership of the lot. Instead, it turns on whether § 853(n)(6)(A) divests the government of its § 853(c) forfeiture right to Peck's transferred criminal proceeds. *Nava* never got that far.

15

The majority contends that *Nava* renders *Totaro* unhelpful to the government because, it says, *Nava* "[d]istinguish[es] cases like *Totaro* because of their exceptional circumstances." Maj. Op. at 32. Though *Nava* does not use this language, and though I see nothing exceptional about the ownership situation in *Totaro*, I note that whatever was exceptional does not mean that the daughter's ownership under § 853(n)(6)(A) defeats the government's § 853(c) vested forfeiture right to any criminal proceeds embedded in the properties. I see nothing in *Nava* to that effect.

**Eighth**, in my view, the majority minimizes the far-reaching effect of its ruling. In its briefing, the government properly sounds an alarm about the harm to the criminal-forfeiture system from the district court's ruling. I can't agree with the majority that "there is no cause for alarm." Maj. Op. at 33. After today's ruling, criminals have free rein to transfer their criminal proceeds to "friends" who can embed the proceeds in some property or another. For that reason, I must disagree with the majority's words that its "decision today in no way suggests defendants may evade responsibility in criminal proceedings by freely transferring tainted funds to third parties." *Id.* Peck and Dunn know otherwise.

And the majority's stated bases for rejecting the government's "concerns about the potential consequences of affirmance" hardly make up for it. *Id.* Leaving the government to chase "substitute property" under § 853(p) will often be leaving the government with nothing, as it appears will happen now.

16

Absent the court's ruling today, the government would enforce Congress's desired remedial purpose and regain Peck's hijacked and now safely embedded criminal proceeds resting in Dunn's lot, not be left to search in vain for substitute property.

I respectfully dissent.